*In re* JOSÉ A. FELICIANO, abogado y notario.

*Número:* MC-84-2     *Resuelto:* 16 de marzo de 1984

*Miguel Pagán, Subprocurador General,* y *Eliadís Orsini Zayas, Procuradora General Auxiliar,* abogados de El Pueblo; *José A. Feliciano, pro se.*

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

I

El Informe del Procurador General se origina en una queja del Sr. Abraham Maysonet contra el notario José A. Feliciano, quien alegadamente se niega a inscribirle y a entregarle copia certificada de una escritura de compraventa. Maysonet expuso que pagó para la inscripción, pero admite no haberle satisfecho al notario sus honorarios. Adujo, sin embargo, que en ausencia de pacto, "se supone que [fuera] la parte vendedora" la que lo hiciera. Alega que debido a la relación de amistad entre la vendedora y el notario Feliciano, éste pretende cobrarle a él.

Por su parte, el notario Feliciano sostuvo ante el Procurador que su negativa responde a que Maysonet no le ha pagado por "consultas, asesoramiento y gestiones realizadas para su beneficio y con su conocimiento; gastos y honorarios por constitución de una hipoteca; su parte correspondiente de gastos y honorarios de la escritura de venta judicial; gastos de inscripción y otros de la escritura de compra del 50% de la Sra. Emma Camareno . . . [y] de la escritura de venta a la corporación". Finalmente, reitera su "posición de

que como custodio de dichos documentos públicos no habr[á] de expedir copias certificadas de los mismos hasta tanto no se [le] paguen los honorarios correspondientes y los gastos de inscripción procedentes".

El Procurador General nos señala la ausencia de precedente y guías claras en nuestra jurisdicción sobre un aspecto tan sensitivo y ético de la praxis notarial. Interpretamos su comparecencia como un reclamo legítimo a que nos pronunciemos al respecto. *In re Cancio Sifre*, 106 D.P.R. 386, 389 (1977).

## II

Nuestra jurisprudencia establece que los servicios prestados por un abogado no generan un gravamen o "derecho de retención de los documentos y papeles del cliente". *Cornier* v. *Tribunal Superior*, 96 D.P.R. 253, 255 (1968); *In re Vélez*, 103 D.P.R. 590, 599 (1975). No existe disposición estatutaria que lo autorice. Tampoco la ley —y así lo resolvemos— con relación al ejercicio de la notaría.

El notario es un "profesional" en toda la extensión de la palabra. *Pueblo* v. *Central Cambalache*, 62 D.P.R. 553, 561 (1943). "[P]or su condición de abogado, se funden dos facetas esenciales en la administración de la justicia. La *primera*, la que surge como profesional del derecho, preparado académica e intelectualmente para las lides forenses y comparecencias ante foros adjudicativos. Como tal está versado en la técnica jurídica y capacitado para dar consejos y servir de guía a todo interesado, no sólo en este rol, sino en el de notario. En su segunda faceta, la de notario, es funcionario público investido de autoridad y con capacidad autenticadora y legalizadora en el plano de las relaciones privadas, imponiendo a los actos que ve y oye —*visus et audit*— una eficacia autenticadora cubierta con una presunción de veracidad, producto neto que parte del supuesto de un leal acatamiento de los requisitos y formalidades de ejercer con fidelidad su encomienda." *In re Lavastida et al.*, 109 D.P.R. 45,

97 (1979). No se discute, pues, su derecho a ser retribuido. La cuestión suscitada es resolver cómo se determina y sus límites.

De los distintos sistemas disponibles que existen para cimentar en qué sostener la retribución —cantidad libremente estipulada entre el notario y la parte; sueldo gubernamental; o con arreglo a un arancel o tarifa— ([1]) la inmensa mayoría de países de tradición civilista han optado por esta última. La justificación de este enfoque se expone así:

> Si el cargo de Notario fuera solamente una función, no cabe duda que el sistema lógico habría de ser el sueldo. Si se tratara solamente de una profesión libre debería optarse por la retribución libre. Más [*sic*] reuniendo el doble carácter que la función tiene, la fórmula del Arancel se impone. Tiene además dos ventajas: de una parte, evita la concurrencia desleal, y de otra, los posibles excesos en la percepción de honorarios. E. Giménez-Arnau, *Derecho Notarial*, Pamplona, Ed. Univ. de Navarra, 1976, pág. 267; A. Neri, *Tratado teórico y práctico de Derecho notarial*, Buenos Aires, Ed. Depalma, 1970, Vol. 3, pág. 1060.

El arancel ([2]) notarial vigente —Ley de 8 de marzo de 1906— prescribe que los "notarios percibirán por el *otorgamiento* de los documentos que *ante ellos* se hagan, y por las *copias* que de los mismos libraren, los honorarios" fijados a base de determinada cantidad por folio o por porcentaje,

---

([1]) P. Ávila Álvarez, *Estudios de Derecho Notarial*, 4ta ed., Madrid, Ed. Montecorvo, 1973, pág. 427.

([2]) "La palabra *Arancel*, según la Academia de la lengua, viene del árabe *alamzila*, modelo; y según otros, de la palabra también árabe *marasem*, ordenanza. *Arancel* no es otra cosa que un cuadro oficial que indica los derechos exigibles en el ejercicio de un arte, profesión ú oficio reglamentados." M. Fernández Casado, *Tratado de Notaría*, Madrid, Ed. Vda. M. Minuesa, 1895, T. I, pág. 273.

En época más reciente se dice: "En el lato sentido de la palabra, 'arancel' es la tabla, lista o catálogo en el que se tarifan los derechos; es, igualmente, el reglamento enunciativo de los derechos que deben pagarse en dinero. En la acepción técnico-jurídica, el arancel es el registro de precios. Por tanto, con relación a la función notarial el arancel importa el documento en que legal u oficialmente se tarifan los derechos que las partes deben satisfacer en pago de la prestación de servicios que demanda la contratación jurídica." A. Neri, *Tratado teórico y práctico de Derecho notarial*, Buenos Aires, Ed. Depalma, 1970, Vol. 3, pág. 1058.

según la cuantía envuelta. 4 L.P.R.A. sec. 847. Por otro lado, la Ley Núm. 101 de 12 de mayo de 1943 en conjunción con la Ley Notarial —Núm. 99 de 27 de junio de 1956— disponen, respectivamente, el cobro de derechos por instrumentos públicos en sellos de rentas internas y del Colegio de Abogados de Puerto Rico. 4 L.P.R.A secs. 851 y 1006. Esta última sección (1006) consigna también que "[s]erá deber de todo notario adherir y cancelar en cada escritura original que otorgare y en las copias" los mencionados sellos. "El costo de los sellos del Colegio de Abogados será sufragado por el notario . . . [quien] no podrá transferir [su] costo a los clientes." Por su parte, "[l]os documentos públicos en donde se haya dejado de adherir los correspondientes derechos sólo serán anulables *si cualquiera de las partes en los mismos no entregara al funcionario correspondiente, para su cancelación inmediata, el importe total de dichos derechos, todo ello sin perjuicio de lo dispuesto en la sec. 1035 de este título".* 4 L.P.R.A. sec. 1020.

◼ Además, para identificar propiamente la función y caracteres de la retribución notarial son relevantes que: (a) la Ley expresamente declara que los protocolos son secretos y pertenecen al Estado, aun cuando permanecen bajo la custodia de los notarios concernidos, 4 L.P.R.A. secs. 1028 y 1034; (b) las partes, causantes y personas interesadas tienen derecho de obtener copias certificadas de las escrituras "mediante el pago del coste de reproducción de dichas copias *más los honorarios provistos por ley* para la expedición de copias y el pago de los correspondientes derechos de rentas internas establecidos por ley". (Énfasis suplido.) 4 L.P.R.A. sec. 1025; y (c) se les obliga a adherir y cancelar sellos de rentas internas y notariales en los documentos. Ese deber "recae primordialmente sobre los notarios, sin que por ello las partes qued[en] relevadas de la responsabilidad de suministrar los sellos al notario". *Lázaro* v. *Sucn. Toro Cabañas,* 53 D.P.R. 201, 205 (1938).

## III

Como método, el uso del arancel tiene como ventaja (3) "lo que se pudiera llamar su automatismo, en cuanto los tipos y escalas se refieren a una gran cantidad de casos en que concurren circunstancias similares desde el punto de vista de la valoración del servicio prestado.

"Pero precisamente por ese automatismo, interpretado con rigor, se pueden plantear supuestos de aplicación injusta, porque la tasa oficial de derechos no puede tener en cuenta matices de mucha trascendencia en el estudio y la resolución de asuntos que les dan un carácter muy singular a[u]n dentro de una sustancial unidad de contenido al que, genéricamente, se refiere el arancel.

"El automatismo riguroso puede por ello constituir el mayor inconveniente del arancel, si en la casuística establecida por éste, no hay suficiente elasticidad y amplitud que comprenda la gran variedad de supuestos que pueden plantearse dentro de un mismo tipo o concepto de intervención profesional". Giménez-Arnau, *op. cit.*, pág. 267.

En la doctrina científica moderna se aceptan los siguien-

---

(3) "Desde luego, el arancel existe, y es bueno; clara y sistemáticamente fija los derechos perceptibles; en una palabra: el arancel conforma, en general, las aspiraciones de los escribanos. Puede observarse, no obstante, que algunos aranceles no acusan una justipreciación racional, ya que para ciertos actos y contratos existen regulaciones exiguas que no guardan proporción con el trabajo que ellos demandan; en tanto que para otros, con menos tareas, hay una subida tasación. El hecho es bien evidente, pues ciertas escrituras se dan por otorgadas con una mínima tarea, mientras que otras, de igual naturaleza y monto, exigen un quehacer mayor; lo que ciertamente entraña una falta de equidad. Por otra parte, no todo lo que el escribano produce en el quehacer funcional está remunerado por el arancel; buena parte de clientes piden que se les provea de una minuta relativa al acto o contrato postulado, a fin de 'estudiarla', minuta que luego modifican mediante agregados o rectificaciones, y ello implica la realización de trabajos conexos que los aranceles, por lo general, no contemplan. En otro sentido, para 'hacer' honorarios respecto de escrituras llanas en derecho, el notario echa mano al rutinarismo, y en su virtud transcribe documentos que la ley no exige, y que sólo basta referirlos; o bien reproduce disposiciones legales, cuya inserción es inútil, o transcribe cláusulas superfluas, o relaciona antecedentes que no vienen al caso; todo lo cual hace que surja una escritura larga, prosaicamente trabajosa y generalmente carente de técnica y pureza." (Escolio omitido.) Neri, *op. cit.*, pág. 1070.

tes factores como presupuestos de una retribución arancelaria: "1° la cuantía económica del acto contrato; 2° la dificultad técnica que ofrezca su redacción; 3° la extensión material del mismo; y 4° el lugar donde se autoriza, pues cuando el Notario abandona su despacho, no solamente sufre una incomodidad sino que invierte una mayor cantidad de tiempo". Giménez-Arnau, *op. cit.*, pág. 267.

En Puerto Rico rige un sistema de tipo ecléctico. El arancel notarial vigente corresponde propiamente al otorgamiento y autorización de un instrumento. Todo concepto expresamente regulado en el mismo obliga a su estricta observancia. "[L]a escritura que firman las partes y que es la única para la cual el arancel notarial fija precio." *Largé & Acevedo* v. *Fernández*, 38 D.P.R. 508, 513 (1928). Sin embargo, no cubre ni limita honorarios no arancelarios que tienen su génesis y justifican ciertas gestiones previas y preparatorias, e inclusive [4] posteriores, tales como estudios de antecedentes, título, consultas, dictámenes, preparar minutas [5] y mandatos retribuidos en que el notario presta un servicio adicional como jurista, actividad no reglada ni contemplada por el legislador en el arancel. "El Notario, por su calidad de jurista, puede desempeñar su actividad de tal, tanto independiente de todo instrumento (consultas, dictámenes, etc.) como previa y preparatoria de un instrumento. En el primer supuesto podrá percibir sus honorarios como otro jurista cualquiera y sin sujeción al Arancel Notarial. En el segundo supuesto, si su actividad como jurista cristaliza documentalmente antes del instrumento, pudiendo así

---

[4] "Dada la costumbre—cuya existencia es indudable—de encomendar al Notario las gestiones posteriores y complementarias del otorgamiento de una escritura, no es lícito dudar que dicho funcionario puede exigir una remuneración adecuada al servicio prestado, remuneración cuya cuantía conviene que sujete á alguna regla ó proporción y la notifique al cliente en el acto de recibir el encargo." Fernández Casado, *op. cit.*, Vol. 1, pág. 292.

[5] "20 La aplicación del arancel presupone la otorgación de una escritura; preparar una minuta para que el cliente la examine representa otra cosa. Esta extraactividad debiera ser objeto de un honorario adicional." Neri, *op. cit.*, pág. 1070.

destacarse de su actividad 'funcionarista' (cuaderno particional, estatutos de sociedades, minutas de escrituras . . .) no cabe duda que podrá también percibir honorarios extra-arancelarios como profesional del Derecho . . . ." Ávila Álvarez, *op. cit.*, págs. 20-21. En esas situaciones existe libertad para pactar honorarios, claro está, guiado ese libre albedrío por la costumbre y los criterios de razonabilidad aplicables y pertinentes plasmados en el Canon 24 del Código de Ética Profesional.[6] Todo "trabajo distinto de la redacción u otorgamiento de la escritura . . . debe ser pagado independientemente de lo fijado por el arancel para la escritura". *Largé & Acevedo* v. *Fernández,* supra, pág. 513.

De todo lo anterior se deduce que los honorarios del notario por certificar una copia están predispuestos en la ley. Por ende, si una parte interesada[7] satisface esos honorarios y derechos de rentas internas, el notario no puede negarse a prestar ese servicio bajo pretexto de que no le han pagado otros honorarios no arancelarios, aun por servicios legítimos prestados (*v.g.,* estudios de título, redacción de contrato o estudios de cláusulas extraordinarias). Tiene que expedir la copia certificada. Véase *Román* v. *Agosto,* 27 D.P.R. 574 (1919). Claro está, un notario a quien no le pagan

---

[6] "El doble aspecto que representa, como profesional del derecho, todo abogado-notario, tiene unas consecuencias particulares en la evolución de la deontología notarial. Históricamente, nuestros cánones para regular el ejercicio de la profesión de abogado han sido tomados de aquellos adoptados por la Asociación Americana de Abogados (A.B.A.). La diferencia conceptual y profesional del ejercicio de la notaría en los Estados Unidos, ha hecho posible, sin quererlo, que las normas éticas sobre el notariado del país estén sumergidas con aquellas que corresponden propiamente al abogado. El énfasis, publicidad e importancia ha sido [*sic*] sobre el Código de Ética Profesional, olvidándonos de la existencia propia de la Deontología Notarial, *independientemente de que aceptemos, según veremos, que su ámbito constantemente roza y converge—y en ocasiones es idéntico—con la doble esfera de actuación de abogado-notario.*" *In re Lavastida, et al.,* 109 D.P.R. 45, 98 (1979). (Énfasis suplido.)

Adviértase, sin embargo, que la "integridad ética del abogado no puede sufrir fragmentación en los distintos campos de actividad". *In re Maldonado Rivera,* 103 D.P.R. 523, 525 (1975).

[7] A. Rodríguez Adrados, *Personas con Derecho a Copia,* 101-102 Rev. Der. Not. 223 *et seq.* (1978).

previamente los honorarios estipulados en ley o los sellos de rentas internas no viene obligado a otorgar, dar fe, ni autenticar el instrumento concernido. Si el interesado no retribuye sus honorarios y el monto de sellos de rentas internas, el notario puede lícitamente excusarse y abstenerse de intervenir y legitimar el negocio.

Razones poderosas fundadas en la naturaleza y función eminentemente pública del quehacer notarial, nos mueven a concluir que una vez el notario autoriza una escritura, no puede sustraerla, como tampoco condicionar la juridicidad de haber dado fe, fundado en que no se han satisfecho sus honorarios no arancelarios. Desde el momento que opta por realizar el acto notarial se expone a que queden relegados a segundo plano tales honorarios no arancelarios y por ende forzado a instar una acción ordinaria para cobrarlos al amparo del Art. 1473 del Código Civil. 31 L.P.R.A. sec. 4111. A poco reflexionemos nos percatamos de que es la única interpretación compatible con la función pública y el ejercicio excelente de la práctica notarial que rechaza toda noción de afán de lucro desmedido. Un notario puede arriesgarse —pero no viene compelido a autorizar determinada escritura— sin haber recibido sus honorarios no arancelarios y los arancelarios, inclusive los sellos de rentas internas correspondientes. Ciertamente no debe hacerlo si no tiene disponibles esos sellos de rentas internas para cancelarlos inmediatamente. Su responsabilidad por omitir cancelarlos es de naturaleza continua. *Lázaro v. Sucn. Toro Cabañas*, supra, pág. 207. Trasciende el ámbito de lo civil para penetrar en la jurisdicción disciplinaria. Se expone a graves sanciones correctivas, inclusive la separación del ejercicio de la profesión. *In re Arroyo Rivera*, 63 D.P.R. 796 (1944); *In re Rey González*, 56 D.P.R. 936 (1940); *In re Mas*, 56 D.P.R. 940 (1940). Por propia voluntad realiza una acción inconclusa e incompleta.[8] De pobre valor decisorio sería refrendar la

---

[8] En *In re Laboy*, 113 D.P.R. 476 (1982), señalamos el peligro potencial y

tesis de que por no producirlos el cliente, el notario no tiene ninguna obligación. La Ley Notarial impone ese deber primario sobre el notario y no crea un gravamen ni derecho de retención (*lien*) que pudiera favorecer al notario Feliciano en la alegada negativa a expedir copia certificada de la escritura de compraventa.

## IV

Los hechos ante nuestra consideración no están suficientemente depurados y no nos permiten adjudicar satisfactoriamente el asunto. Desconocemos los términos del pacto, si alguno, entre el quejoso Maysonet, como comprador, y el notario Feliciano. Según la doctrina prevaleciente, "es el comprador y no el vendedor quien tiene derecho a elegir el notario". *Pueblo* v. *Central Cambalache*, supra, pág. 559. Y el Art. 1344 del Código Civil establece que los "gastos de otorgamiento de escritura serán de cuenta del vendedor, y los de la primera copia y los demás posteriores a la venta serán de cuenta del comprador, salvo pacto en contrario". 31 L.P.R.A. sec. 3751. Estas disposiciones presuntivamente favorecen a Maysonet. Prima facie, no le correspondía satisfacer los "gastos" originales —los honorarios, el arancel y los sellos de rentas internas y notariales.

En las circunstancias apuntadas, *procede que dictemos sentencia en que se devuelva el asunto al Procurador General para reinvestigación de hechos y presentación de nuevo Informe compatible con lo expuesto.*

El Juez Asociado Señor Dávila concurre en el resultado sin opinión.

---

exhortamos a los notarios a abstenerse de intervenir, urgente o incidentalmente, al autorizar mecánicamente instrumentos preparados por otros notarios.