Luis Mojica Sandoz, Registrador de la Propiedad, Caguas I, promovente, *v.* Bayamón Federal Savings and Loan Association of P.R., promovido.

*Número:* CE-85-499 *Resuelto:* 26 de marzo de 1986

112

114

*Luis Mojica Sandoz, Registrador de la Propiedad,* promovente; *José R. Fournier Torres,* abogado del promovido; *Benigno Alicea Alicea* y *Carmen Ana Rodríguez Maldonado* de la Sociedad para Asistencia Legal, comparecen como *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 30 de marzo de 1985, el Bayamón Federal Savings and Loan Association of Puerto Rico presentó para inscripción una Hipoteca sobre Bienes Muebles en el Registro de la Propiedad, Sección Primera de Caguas. Los documentos, suscritos el 22 de marzo de 1985, se ajustaban fielmente a todos los requisitos y seguían estrictamente el modelo de hipoteca y de declaración jurada que contiene la Ley Hipotecaria de Propiedad Mueble, Ley Núm. 19 de 3 de junio de 1927 (30 L.P.R.A. sec. 1871 *et seq.*).

El Registrador notificó que la declaración jurada adolecía de falta de no dar fe en la misma, el notario Lic. José R. Fournier Torres, de haber cancelado el sello de la Sociedad para Asistencia Legal en el Registro de Afidávit, según exigido por la Ley Núm. 47 de 4 de junio de 1982 (4 L.P.R.A. secs. 896–899). El Bayamón Federal objetó ese requerimiento. Alegó que ninguna ley obligaba a esa dación de fe y que correspondía al Inspector de Protocolos velar el cumplimiento de ese deber. El Registrador, al reiterar su negativa, adujo los siguientes defectos adicionales: no dar fe de haber inscrito el afidávit en el Registro ni indicar que se incluyó en el índice semanal, requisitos que, de no cumplirse, anularían el afidávit conforme la Sec. 8 de la Ley de 12 de marzo de 1908 (4 L.P.R.A. sec. 894).

En un nuevo escrito de recalificación el Bayamón Federal reafirmó su postura. Además invocó una presunción legal de cumplimiento notarial según nuestra decisión en *Ana María Sugar Co., Inc.* v. *Carlo et al.*, 25 D.P.R. 96 (1917).[1]

El Registrador entonces le notificó una Nota Denegatoria[2] y acudió ante este foro en virtud de la facultad confe-

---

[1] En dicho caso la parte demandante presentó una demanda jurada. Los demandados solicitaron desestimación y alegaron la nulidad del afidávit, pues éste no declaraba que se hubiera inscrito en el Registro de Afidávit. En esa contienda *judicial* resolvimos que "existe una presunción legal de que el Notario cumplió con la Ley que le impone el deber de registrarlo [el afidávit]". Pág. 103.

[2] En la Nota Denegatoria expuso:

"Se deniega la inscripción solicitada por los fundamentos siguientes:

'(1) Con arreglo a lo dispuesto en la Sección 8 de la Ley de 1 de ma[rzo] de 1908, que reglamenta la toma de declaraciones juradas y affidavits, y de la Ley Núm. 47 de 1982, las declaraciones no registradas y en las que no se ha cancelado el sello para beneficio del programa de Asistencia Legal, son nulas y carecen de eficacia.

'(2) El notario no refiere que haya cumplido con dichas formalidades.

'(3) Las presunciones no suplen la certeza que la inscripción de documento exige (*Esteves* v. *Registrador*, 43 DPR 7).

'(4) El affidavit, aunque privado, es también, al igual que la escritura, un documento notarial, y no puede entenderse que sea distinta la responsabilidad del notario, en uno u otro caso, respecto a revelar el cumplimiento

rídale por el Art. 77 de la Ley Hipotecaria y del Registro de la Propiedad —Núm. 198 de 8 de agosto de 1979— 30 L.P.R.A. secs. 2001 *et seq.* y 2280. Su posición es que en su función calificadora puede y debe requerir del notario que autoriza un afidávit para inscripción —según la Ley Hipotecaria de Propiedad Mueble— dar fe en el mismo de haber cumplido los requisitos imprescindibles para su validez. Por su parte, el Bayamón Federal reproduce sus argumentos originales.

A solicitud de la Sociedad para Asistencia Legal accedimos que interviniera como *amicus curiae.* Su comparecencia, coincidente con la del Registrador, enfatiza que los servicios del derecho a asistencia de abogado para indigentes están en juego, pues la venta de tales sellos representa un ingreso importante para sus gastos operacionales.

Nos aduce que "[a]dherir y cancelar el sello a favor de la Sociedad, inmediatamente, y cada vez que se otorgue una declaración jurada o afidávit, es lo que le da validez y realidad práctica al objetivo de la Ley Núm. 47. Para ello no se puede depender exclusivamente de la visita que de tiempo en tiempo hace el Inspector de Protocolos a todo notario".

Este reclamo está apuntalado en la aparente dificultad que representa el fluir rápido y regular de ingresos a la Sociedad si la constancia de haberse cancelado el sello está solamente sujeta a las visitas que, anualmente o cada dos (2) años, realizan los inspectores de la Oficina de Inspección de Protocolos y Notarías. ([3]) La preocupación parece tener base. Innumera-

---

de requisitos que afecta la validez de la forma, no siendo únicamente la responsabilidad del Inspector de Protocolos el examinar que se haya cumplido, sino que también compete a la facultad calificativa del Registrador. (*Rosario* v. *Registrador,* 65 DPR 464; *Sánchez* v. *Registrador,* 69 DPR 474.)

'(5) Que la declaración jurada del deudor hipotecario es requisito esencial en el caso de los contratos de hipoteca mobiliaria, según la Sección 5 de la Ley Hipotecaria de Propiedad Mueble.'"

([3]) Al 30 de junio de 1985, había aproximadamente 3,654 notarios autorizados. Para inspeccionar la obra notarial de éstos, sólo hay siete ins-

bles asuntos de los que semanalmente nos refiere su director reflejan la indeseable práctica, aunque limitada, de algunos notarios no adherir y cancelar el sello seguidamente después del acto. Optan por posponerlo y acumularlos, para hacerlo de una sola vez cuando anticipadamente son notificados de la visita del Inspector. Este modus operandi razonablemente implica que no han adquirido o no tienen suficientes sellos para subsanar esa condición deficiente del Registro. Para cumplir con la ley entonces tienen que adquirir urgentemente un número sustancial de sellos del Secretario de Hacienda. Esta acumulación necesariamente habrá de repercutir y atrasar el fluir regular de los ingresos hacia la Sociedad. La súbita entrada de fondos así acumulados tiende a afectar su estabilidad, y a debilitar los propósitos de la ley.

▮ En resumen, los planteamientos de las partes conllevan que analicemos la naturaleza del afidávit como documento notarial; el deber o deberes del notario respecto a su autenti-

---

pectores. La labor de estos funcionarios es digna de elogio. Factores tales como el alto número de notarios activos, dificultades en coordinar las visitas, distancias que tienen que recorrer, y otros, impiden que las inspecciones puedan realizarse más frecuentemente.

Los últimos cinco (5) años reflejan el siguiente movimiento de afidávit autenticados: 1980—1,339,990; 1981—1,185,524; 1982—1,108,533; 1983—762,686; 1984—1,347,270. La información para el 1985 no estaba disponible a la fecha de esta opinión pues la Oficina de Inspección de Notarías continuaba recibiendo informes anuales de ese año.

Estas estadísticas incluyen afidávit oficiales, exentos del pago de sellos, otorgados por los abogados de la misma Sociedad para Asistencia Legal, los de la Corporación de Servicios Legales y también los que corresponden a funcionarios de distintas agencias gubernamentales. La actividad es impresionante.

En cuanto a la labor de la Oficina del Inspector, la siguiente tabla es orientadora:

| ACTIVIDADES | 1982–83 | 1983–84 | 1984–85 |
|---|---|---|---|
| Visitas a Notarías | 3,279 | 4,154 | 3,770 |
| Escrituras Examinadas | 118,539 | 108,789 | 113,444 |
| Informes Finales Rendidos | 2,264 | 2,440 | 2,298 |
| Registros de Afidávit | 2,166 | 2,178 | 1,960 |

cación a la luz de la ley sobre el sello de la Sociedad para Asistencia Legal; los efectos jurídicos del incumplimiento de ese deber por el notario; la naturaleza de la función calificadora del Registrador al examinar documentos que tienen acceso registral en virtud de una ley especial; su interacción y el alcance del poder calificador del Registrador bajo la Ley Hipotecaria de 1979 en tales instancias, y por último, cuál es la mejor práctica notarial al respecto. No podemos menos que considerar todos estos aspectos dada la naturaleza preceptiva de nuestra jurisdicción cuando de recursos gubernativos se trata. *Housing Inv. Corp.* v. *Registrador,* 110 D.P.R. 490 (1980).

## I

A principios de siglo el tratamiento jurisprudencial del afidávit, a nivel conceptual, estuvo notablemente influenciado por el origen anglosajón según plasmado en la legislación de esa época. *Delgado* v. *El Registrador de Caguas,* 22 D.P.R. 125 (1915); *Hernández* v. *Rosado et al.,* 22 D.P.R. 387 (1915); *Hermida & Palos* v. *Gestera,* 23 D.P.R. 100 (1915); *Santaliz* v. *Registrador,* 71 D.P.R. 84 (1950); *cf. Diccionario de Derecho Privado,* Barcelona, Ed. Labor, 1954, T. I, pág. 255; C. E. Mascareñas, *Nueva Enciclopedia Jurídica,* Barcelona, Ed. Francisco Seix, 1958, T. II, págs. 449–450; H. C. Black, *Black's Law Dictionary,* 4ta ed., St. Paul, Minn., West Pub. Co., 1951, pág. 80.

Como tantas otras figuras jurídicas angloamericanas advino a nuestro aservo jurídico luego del cambio de soberanía, específicamente a través de las leyes de 12 de marzo de 1903 y de 12 de marzo de 1908 (4 L.P.R.A. sec. 881 *et seq.*); L. Muñoz Morales, *Apuntes de Derecho Notarial,* X Rev. Jur. U.P.R. 95, 195 (1940). En virtud de esta última ley "[l]lámase afidávit o declaración de autenticidad el acto y el documento, mediante los cuales, un notario u otro de los fun-

cionarios designados [por ley] *certifica o da fe* de la *verdad o reconocimiento de una firma*, de un juramento, o de otro hecho o contrato que afectare a propiedad mueble o inmueble, no formalizados en escritura pública". (Énfasis suplido.) 4 L.P.R.A. sec. 887. También la ley prescribe la fórmula y lenguaje del afidávit o declaración de autenticidad. En la dinámica de la operación notarial, para rodear y fortalecer el acto de suficiente garantía circunstancial de veracidad y a la par perpetuarlo, ordena que cada "afidávits o declaraciones de autenticidad *llevarán una numeración sucesiva y continua* y cada declaración *será encabezada por el número que le corresponda y que será correlativo al de la inscripción* en el registro que más adelante se establece". (Énfasis suplido.) 4 L.P.R.A. sec. 889. En este registro se consignarán "notas concisas fechadas, numeradas, selladas y suscritas por los mismos notarios, haciendo constar el nombre de los otorgantes y la naturaleza del acto autenticado". 4 L.P.R.A. sec. 891. Además, se dispone la confección de un índice y su oportuna notificación semanal el lunes siguiente a la Oficina de Inspección de Registros y Notarías. (⁴) 4 L.P.R.A. sec. 1026. Se preceptúa la nulidad del afidávit o declaración no inscrito en dicho registro o no incluido en el índice. 4 L.P.R.A. sec. 894.

---

(⁴) No podemos coincidir con la tesis restrictiva del Bayamón Federal fundada en el esquema legal vigente de supervisión sobre arancel correspondiente a la Oficina del Director de Inspección de Registros y Notarías. De ordinario el mismo remite a su competencia exclusiva velar el fiel cumplimiento de los deberes dimanantes del ejercicio del notariado. 4 L.P.R.A. secs. 1026, 1038. Pero esa encomienda no cubre aspectos de derecho sustantivo. *Soto de Bernier* v. *Rivera Cestero*, 106 D.P.R. 35, 39 (1977). La función del Inspector de Protocolos no se equipara a la facultad de calificación de documentos del Registrador. *Rivera Miranda* v. *Betancourt*, 111 D.P.R. 147, 149 (1981). En sus respectivas órbitas, ambas funciones no son incompatibles por el solo hecho de que en ocasiones sus intervenciones y señalamientos puedan coincidir. Lo contrario conllevaría imponer una camisa de fuerza no contemplada a la importante función calificadora del Registrador —*Rosario* v. *Registrador*, 65 D.P.R. 464 (1945), seguido en *Sánchez* v. *Registrador*, 69 D.P.R. 474 (1949)— y también al propio Inspector de Protocolos.

120

■ Con los años el enfoque y la casuística fue variando, acercándonos más a ciertas características resultantes de la tradición de notariado latino. Así, en el aspecto de dar fe de conocimiento de los comparecientes, impusimos al notario que autoriza un afidávit responsabilidad similar al que redacta una escritura pública. *In re Landing; y Aulet*, 107 D.P.R. 103 (1978); *Rodríguez Vidal* v. *Benvenutti*, 115 D.P.R. 583 (1984). Y en *Bldg. Maintenance Serv.* v. *H.R. Exec. Bldg.*, 109 D.P.R. 656, 668 (1980), sostuvimos que por su propia naturaleza, los registros de afidávit como los protocolos notariales, son registros públicos. Esa trayectoria nunca opacó el prisma decisorio fundamental: un afidávit ciertamente no es ni puede equipararse a una escritura pública. *Delgado* v. *El Registrador de Caguas*, supra; *Hernández* v. *Rosado et al.*, supra; *Pietri* v. *El Registrador*, 22 D.P.R. 729 (1915).

■ La dación de fe notarial en el afidávit se limita a la comparecencia y suscripción del documento (y en los casos apropiados a haberse hecho el juramento), y no al *contenido* de lo declarado como en el caso de las escrituras. E. Giménez-Arnau, *Derecho Notarial*, 2da ed., Pamplona, Ed. Univ. Navarra, 1976, págs. 398–402; *Bldg. Maintenance Serv.* v. *H. R. Exec. Bldg.*, supra; *Rodríguez Vidal* v. *Benvenutti*, supra. En este último caso declaramos que "afidávit" es un concepto genérico dentro del cual existen varias modalidades o especies de declaraciones de autenticidad. Su razón estaba en que bajo el término afidávit de nuestra ley se incluyen varios conceptos del derecho angloamericano. En el derecho anglosajón, afidávit es propiamente la declaración jurada ante funcionario autorizado que autentice la declaración. *Black's Law Dictionary, op. cit.*; J. A. Ballentine, *Ballentine's Law Dictionary*, 3ra ed., Rochester, Lawyers Pub. Co., 1969. Las demás caen dentro del género de "reconocimientos" (*acknowledgment*). *Ballentine's, op. cit.*, pág. 15. *Black's, op. cit.*, pág. 39.

■ Por ser de origen anglosajón es arriesgado calificar el afidávit dentro de alguna de las categorías científicamente puras que han moldeado el derecho notarial latino. No obstante, conforme el Art. 1170 del Código Civil, el afidávit "autorizad[o] por un notario . . . , con las solemnidades requeridas por la ley" es un documento público. 31 L.P.R.A. sec. 3271. Bajo esta visión, repetimos, este Tribunal "por vía de analogía" —*Rodríguez Vidal* v. *Benvenutti*, supra— ha aplicado a los afidávit cierta normativa propia de los instrumentos públicos.

■ En resumen, el afidávit es una figura exógena a nuestro derecho notarial de raíz española. Es el método o forma de autenticar y dar fe pública de la efectiva comparecencia de una persona y su firma. A esa definición estatutaria, en algunos extremos, le fueron inyectadas jurisprudencialmente ciertas características operacionales de las escrituras públicas. La declaración de autenticidad en el afidávit es limitada. Por ello aunque "no es un mero escrito privado", *Ramos Mimoso* v. *Tribunal Superior*, 93 D.P.R. 551, 554 (1966), pues es un documento auténtico que hace fe pública, *Bldg. Maintenance Serv.* v. *H. R. Exec. Bldg.*, supra, en materia registral es un documento que como regla general, no tiene acceso directo al Registro, salvo las excepciones provistas por ley.

■ A esta trayectoria legislativa y doctrinaria es menester añadir el requisito dispuesto en la Ley Núm. 47 de 4 de junio de 1982. Mediante la misma "[s]erá deber de todo notario cancelar, por cada declaración jurada o afidávit que otorgue, un sello que la Sociedad para Asistencia Legal adoptará y expedirá por valor de un dólar ($1.00)", el cual "[e]l notario adherirá el sello al margen de la nota correspondiente a cada declaración jurada o afidávit incluida en su registro y cancelará el mismo con su sello notarial o con una marca clara y visible". 4 L.P.R.A. secs. 896–897.

El historial de esta pieza legislativa refleja que su propósito claramente fue proveer ingresos adicionales a la Sociedad para Asistencia Legal para superar sus dificultades económicas. *Informe de las Comisiones de lo Jurídico y de Hacienda de la Cámara de Representantes de abril de 1982.* Según su Exposición de Motivos, esta imposición fiscal, se apuntala en el Canon 1 del Código de Ética Profesional que proclama el deber ético de *todo abogado* de ayudar a establecer y promover servicios legales adecuados para quienes no pueden pagarlos. La premisa es un reconocimiento del Poder Legislativo a las "dos facetas esenciales" en que se funde, como profesional, el abogado-notario —*In re Feliciano,* 115 D.P.R. 172 (1984)— cuya "integridad ética . . . no puede sufrir fragmentación en los distintos cargos de actividad". *In re Maldonado Rivera,* 103 D.P.R. 523, 525 (1975).

Aclarada la evolución y naturaleza jurídica del afidávit, examinemos los señalamientos del Registrador.

## II

■ Tanto éste como la Sociedad para Asistencia Legal asumen que el afidávit sin el sello adherido y cancelado en el correspondiente Registro de Afidávit es nulo.

■ En ausencia de un claro y terminante mandato estatutario no podemos refrendar esa tesis. El no cancelar el sello no atenta, per se, contra la dación de fe notarial sobre comparecencia y firma de la persona, que es la finalidad en que gravita esa gestión. Nuestra doctrina no ha sido, *sua sponte,* establecer causas de nulidad o anulabilidad por analogía cuando de documentos notariales se trate. Así, en *In re Cancio Sifre,* 106 D.P.R. 386, 398 (1977) dijimos que "la razón de nulidad [de la escritura en consideración] no debe extenderse más allá de sus propios términos legislados . . .". Este pronunciamiento fue en consonancia con la interpretación

restrictiva con que reiteradamente hemos tratado las causas de nulidad y anulabilidad en el ámbito civil. Véanse: *Sánchez Rodríguez* v. *López Jiménez*, 116 D.P.R. 172 (1985) ; *Sucn. Santos* v. *Registrador*, 108 D.P.R. 831 (1979) ; *Biaggi* v. *Sucn. Esbrí*, 71 D.P.R. 450 (1950) ; *Cintrón* v. *Cintrón*, 70 D.P.R. 770 (1950) ; *Reyes* v. *Torres*, 65 D.P.R. 821 (1946) ; *Pueblo* v. *Central Cambalache*, 62 D.P.R. 553 (1943) ; *Sosa* v. *Sosa*, 58 D.P.R. 470 (1941) ; *Fernández* v. *Loíza Sugar Co.*, 49 D.P.R. 59 (1935) ; *Durán* v. *Registrador*, 40 D.P.R. 832 (1930) ; *Diez de Andino* v. *El Reg. de San Juan*, 25 D.P.R. 477 (1917) ; *Suárez et al.* v. *Banco Territorial y Agrícola*, 16 D.P.R. 630 (1910). El tratamiento español no difiere del nuestro. Giménez-Arnau, *op. cit.*, pág. 458 *et seq.* La razón que informa este análisis de tipo limitado es proteger a las partes, en lo posible, de la negligencia o incumplimiento de los deberes del notario. D. Toledo Álamo, *Nulidad de la escritura pública por razón de forma*, X Rev. Jur. U.I. 15, 24 (1975).

 Abona a esta interpretación que bajo la Ley Notarial —Núm. 99 de 27 de junio de 1956— se atemperó el rigor de las consecuencias de no cancelar los sellos. Su Sec. 6 considera nulas y sin efecto legal alguno las escrituras o sus copias sin los correspondientes sellos. 4 L.P.R.A. sec. 1006. Por otro lado las Secs. 20 y 35 de esa ley claramente están predicadas sobre el carácter anulable de los documentos en que faltan los sellos. 4 L.P.R.A. secs. 1020, 1035. Actualmente un escrito notarial al que le falten los sellos requeridos en la mencionada Sec. 6 de la Ley Notarial, es anulable en el caso extremo en que el importe de los mismos no pueda recuperarse de las partes o del notario y sus sustitutos o causahabientes —*In re Feliciano*, supra— sin perjuicio de la imposición de medidas disciplinarias. *In re Platón*, 113 D.P.R. 273 (1982).

## III

¿Qué tratamiento merece un afidávit como el que nos ocupa con entrada al Registro de la Propiedad bajo una ley especial?

■ En Puerto Rico existe legislación que permite el acceso y registración de hipotecas formalizadas por un instrumento público o documento privado. Ley Hipotecaria de Propiedad Mueble, 30 L.P.R.A. sec. 1871 *et seq.;* Ley de Contratos de Refacción Industrial y Comercial, 10 L.P.R.A. sec. 551 *et seq.;* Ley de Cesión de Cuentas por Cobrar, 10 L.P.R.A. sec. 581 *et seq.* Todas estas leyes presentan el denominador común de que son estatutos de financiamiento. En contraste, en España, por disposición del Art. 3 de la Ley Hipotecaria española, sólo pueden penetrar el Registro documentos y escrituras públicas. *Cf.* B. C. Sánchez-Cañete, *Comentarios a la legislación hipotecaria,* 3ra ed., Pamplona, Ed. Aranzadi, 1982, Vol. 1, págs. 217, 261–263. El legislador español, aunque ha creado una figura jurídica esencialmente idéntica a las nuestras de financiamiento, le ha impuesto el requisito de constar en escritura pública para tener acceso al Registro. Ley de 16 de diciembre de 1954 sobre la Hipoteca Mobiliaria y la Prenda sin Desplazamiento y Reglamento de 17 de junio de 1955. J. M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario,* Madrid, Ed. Cometa, 1984, T. II, pág. 1047 *et seq.*

Nuestra Ley Hipotecaria de Propiedad Mueble es otro trasplante jurídico del derecho angloamericano, E. Vázquez Bote, *Un pretendido Derecho real: La llamada hipoteca de bienes muebles en Derecho puertorriqueño,* 237 Rev. Gen. Leg. Jur. 679, 680 (1974). En una época fue usual el archivo de dichas hipotecas *(chattel mortgage)* en un registro especial. L. A. Jones y R. Bowers, *The Law of Chattel Mortgages and Conditional Sales,* 6ta ed., Indianapolis, Bobbs-Merryll Co. Pubs., 1933, Vol. I, Sec. 236 *et seq.* Desde entonces, se consideraba el afidávit *(acknowledgment)* algo esencial; Jones y Bowers, *op. cit.,* Sec. 34 *et seq.*

■ La ley especial de hipoteca sobre bienes muebles expresamente no consigna ni provee al Registrador normas para la calificación de la legalidad de los documentos. Sin embargo, esta deficiencia no es absoluta. Es evidente el mandato impuéstole de verificar que se cumpla con los requisitos, inclusive el modelo suplido por el legislador. En este sentido, la visión jurídica de que la Ley Hipotecaria relativa a propiedad inmueble y la ley especial de hipotecas sobre bienes muebles son distintas —*Álvarez v. Registrador*, 64 D.P.R. 40, 43 (1944)— no implica una separación total. Después de todo, en los extremos básicos, esta última guarda cierta analogía con la legitimación y publicidad que imparte el Registro de la Propiedad a los documentos públicos. Son leyes *in pari materia* perfectamente armonizables. Por tal razón, y para salvar la insuficiencia apuntada, a la ley especial de hipoteca sobre bienes muebles, deben aplicarse "las normas que rigen la calificación de las hipotecas inmobiliarias, a saber, la legalidad de los documentos . . . y la capacidad de las partes . . .". R. Negrón de Méndez, *Principios básicos para los registros jurídicos de bienes*, Aporte de la Delegación de Puerto Rico, T. I, Ponencias y Comunicaciones Presentadas al III Congreso Internacional de Derecho Registral, 1977, pág. 71.

■ Aunque rige el principio de especialidad —la Ley Hipotecaria de Bienes Muebles— al decir de Roca Sastre, sobre este tipo de documentos presentado, "naturalmente ha de recaer la calificación del Registrador de la propiedad, que ha de ser ejercida de acuerdo a las normas generales". Más adelante, dicho autor expone que "[t]odos estos documentos, han de revestir las formas prescritas por la legislación respectiva o las que haya establecido el uso o práctica en la materia. El requisito del impuesto sobre actos documentados debe cumplirse en todos estos documentos . . .". R. M. Roca Sastre, *Derecho Hipotecario*, Barcelona, Ed. Bosch, 1979, T. II, págs. 275–276. En conclusión, en ausencia de disposición legal en

contrario, la aplicación de una ley especial en nada menoscaba la función regular calificadora del Registrador.

## IV

Analicemos pues esa calificación registral en este recurso bajo la Ley Hipotecaria de 1979 y su Reglamento a la luz del planteamiento del Registrador de que en el ejercicio de esa función puede requerir de los notarios dar fe en los documentos que se presentan al Registro de cumplir las formalidades que requiere la ley para la validez de los instrumentos, *que no consten en el documento ante él.*

La Ley Hipotecaria de 1979 recoge en su Art. 64 los Arts. 18, 100 y 101 de la antigua Ley Hipotecaria para las Provincias de Ultramar de 1893 (30 L.P.R.A. sec. 2267). En su nueva redacción el Art. 64 no siguió las corrientes modernas que confieren al Registrador amplísimos poderes en su función calificadora. E. Vázquez Bote, *La reforma hipotecaria: Dictamen sobre el P. del S. 792 y P. de la C. 915, relativos a un proyecto de ley hipotecaria y del Registro de la Propiedad,* XIII Rev. Jur. U.I. 491, 547–548 (1979); Roca Sastre, *op. cit.,* pág. 258; Chico y Ortiz, *op. cit.,* pág. 651.

Sin embargo, la reforma hipotecaria de 1979, si bien conservadora en algunos extremos, introdujo varias innovaciones importantes. *Ponencia del Departamento de Justicia en torno al Proyecto del Senado 792 y al proyecto de la Cámara 915,* XIV Rev. Jur. U.I. 419, 435 (1980); *Informe del Senado de Puerto Rico sobre el Proyecto del Senado 792,* ibíd., págs. 349, 378 (1980); *Informe de la Cámara de Representantes sobre el Proyecto del Senado 792,* ibíd., págs. 391, 404–405. En el mencionado Art. 64, en especial, tres guardan tangencia con este recurso: (1) se aclaró que la calificación registral "comprenderá las formas extrínsecas de los documentos presentados, la capacidad de los otorgantes y la validez de los actos y contratos contenidos en tales documentos". Art. 64

de la Ley Hipotecaria, 30 L.P.R.A. sec. 2267. A tales efectos, se precisaron los motivos de la calificación al disponer que los "Registradores fundamentarán su calificación de los actos y contratos a registrarse en los documentos que se presenten, los asientos registrales vigentes y las leyes"; (2) el último párrafo del Art. 64 autorizó al Registrador a requerir "los documentos complementarios necesarios para una adecuada calificación, bien sean éstos notariales, judiciales o administrativos," y (3) íntimamente entrelazado a esta gestión calificadora, el Art. 68 de la ley —contentivo del concepto unitario de falta— estableció en su inciso (4), como causa que impide la registración, "no presentar los documentos complementarios necesarios *o no acreditarse el cumplimiento de las formalidades exigidas por las leyes*". (Énfasis suplido.) 30 L.P.R.A. sec. 2271.

En el caso de autos, los términos dilatados en que está concebida la Nota Denegatoria no nos permiten detectar con precisión si el Registrador requirió documentos complementarios o si exigió que se le acreditara que el notario cumplió las formalidades exigidas por ley. La impresión es que actuó dualmente. Ante esa incógnita evaluaremos ambos supuestos.

 Como norma general, la calificación del Registrador en cuanto a los documentos notariales se circunscribe a examinar si éstos cumplen con las formas extrínsecas que requiere la ley, capacidad de otorgantes y si el negocio jurídico contenido es válido. Roca Sastre, *op. cit.*, págs. 268–270; E. Vázquez Bote, *Elementos de Derecho Hipotecario Puertorriqueño*, Barcelona, Artes Gráficas Medinaceli, 1973, págs. 308–310. Tal calificación está limitada por ley a los documentos presentados al Registrador y a lo que resulte de éstos. Art. 64 L.H. El Reglamento Hipotecario, en su Sec. 2003, Art. 76.1 es muy claro:

El registrador considerará, conforme a lo prescrito en el artículo 64 de la Ley [30 L.P.R.A. sec. 2267] como faltas de

legalidad de los documentos cuya registración se solicite, todas las que afecten, tanto a las formas de los documentos como a la eficacia de las obligaciones o derechos contenidos en los mismos, *siempre que resulten del texto de dichos documentos o puedan conocerse por la simple inspección de ellos*. (Énfasis suplido.)

En el tráfico jurídico registral, es plausible que de los documentos presentados resulte que están incompletos y proceda entonces solicitar escritos complementarios. Vázquez Bote, *op. cit.*, pág. 311; Roca Sastre, *op. cit.*, págs. 257, 275, 619 *et seq.*; L. Mojica Sandoz, *Comentarios de jurisprudencia —Ruiz-Sierra* v. *Registrador*, 36 Rev. C. Abo. P.R. 1075, 1078 (1975). En Puerto Rico bajo la vigencia de la vieja Ley Hipotecaria ya habíamos sancionado esa facultad. *P.R. Leaf Tobacco Co.* v. *El Registrador*, 24 D.P.R. 891 (1917). Sin embargo, *Ruiz-Sierra* v. *Registrador*, 103 D.P.R. 578 (1975), la puso en peligro. Interpretamos restrictivamente el Art. 18 de la Ley Hipotecaria de 1893 y sostuvimos que sería ir más allá del referido artículo permitir al Registrador solicitar documentos complementarios, pues éste debía limitarse a lo que surgiera de los documentos presentados.

La reacción no se hizo esperar. *Ruiz-Sierra* v. *Registrador*, supra, fue severamente criticado y expresamente revocado por la vigente Ley Hipotecaria. Mojica Sandoz, *op. cit.*, pág. 1075 *et seq.*; *Informe del Senado, op. cit.*, pág. 378; *Informe de la Cámara, op. cit.*, pág. 405. Dicha facultad, según hemos visto, consta expresamente en el Art. 64, *in fine*.

En *Preciosas V. del Lago* v. *Registrador*, 110 D.P.R. 802 (1981), enfrentamos por primera vez bajo la nueva Ley Hipotecaria una petición de documentos complementarios por el Registrador. Versaba sobre una segregación en contravención a la ley realizada en documento privado al que se hacía referencia en la copia de la escritura presentada al Registrador. En tales circunstancias resolvimos que no sólo podía el Regis-

trador solicitar el referido documento privado sino que debía hacerlo.

■ Así pues, del análisis de la ley actual y sus precedentes surge que los Registradores podrán solicitar la producción de documentos *complementarios* cuando: (1) por ley o por reglamento así se requiera para la inscripción de un documento; (2) del documento presentado al Registrador surja causa para creer que pueda ser inválido (*Preciosas V. del Lago* v. *Registrador,* supra) y (3) el propio documento no refleje su entera validez. En el caso de autos no concurren ninguna de estas tres situaciones.

Ahora bien, la posición del Registrador intenta hallar apoyo en el inciso 4 del Art. 68. Dispone que será falta que impida la registración "no acreditarse el cumplimiento de *las formalidades exigidas por las leyes*". (Énfasis suplido.) 30 L.P.R.A. sec. 2271.

Su lectura nos orienta sobre la distinción básica entre documentos complementarios y acreditación de las *formalidades* requeridas por las leyes. Esta última frase, importada del derecho español, se refiere a los llamados "documentos acreditativos". Roca Sastre, *op. cit.,* T. II, pág. 619. Aunque se admite la diferencia entre ambos tipos de documentos, son confusos sus contornos particulares. Roca Sastre halla el quid diferenciador en el trámite judicial. Así, "no es documento complementario el que acredite el cumplimiento de un *trámite* judicial específico o *asimilable*". Roca Sastre, ibíd., pág. 620. La diferencia es tan sutil que los autores se limitan a dar ejemplos. Roca Sastre, *op. cit.,* págs. 620–624; A. González Román, *Algunos aspectos de la calificación registral y el artículo 68 de la Ley Hipotecaria y del Registro de la Propiedad de 1979,* L Rev. Jur. U.P.R. 221, 228 (1981).

■ Bajo este enfoque, en estricta hermenéutica, rige el principio de que las "leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refi-

130

riendo las unas a las otras . . .". Art. 18 del Código Civil, 31 L.P.R.A. sec. 18. Luego, la Ley Núm. 47 de 4 de junio de 1982 —que impone la obligación al notario de cancelar el sello a favor de la Sociedad para Asistencia Legal— forma parte esencial e integral de la actividad notarial al certificar un afidávit. Esta gestión, aunque posterior, amplía y complementa los deberes contemporáneos de llevar el registro, numerarlo y consignar la nota concisa.

■ Sin embargo, el Registrador sólo está autorizado a exigir constancia de haberse cumplido con aquellas formalidades que por mandato de ley sean procedentes al momento de ser suscrito el afidávit y ser entregado al interesado. Obviamente, el factor tiempo es el criterio determinante para delimitar el alcance de ese requerimiento. Ni la ley especial ni la notarial, como tampoco la jurisprudencia, (5) exigen la dación

---

(5) En *Rosario* v. *Registrador*, 65 D.P.R. 464 (1945), el Registrador se negó a inscribir copia certificada de una escritura de compraventa por no consignarse en dicha copia la cancelación del sello forense del Colegio de Abogados en la escritura original según *requerido* por el Art. 2 de la Ley Núm. 170 de 1939 (4 L.P.R.A. sec. 1006). Anteriormente en *M. Grau e Hijos* v. *El Registrador*, 23 D.P.R. 380 (1916), habíamos enfrentado una situación similar pero en aquel momento con relación al sello de rentas internas exigido por la Ley Núm. 34 de 1912. En *M. Grau e Hijos* v. *El Registrador*, supra, sostuvimos que no venía obligado el notario a dar fe en la copia de la escritura que presenta para inscripción ante el Registro de la Propiedad de haber cancelado el referido sello en el original. Llegamos a esa conclusión porque la Ley 34 no obligaba al notario a hacer tal cosa y además *porque consideramos que el sello no era parte de la escritura* y por tanto no debía ir en la copia la cual según la Ley Notarial entonces vigente (Ley de 8 de marzo de 1906) era el *"traslado literal"* de la original. 4 L.P.R.A. sec. 1023. Esta última fue la consideración decisiva en *M. Grau e Hijos* v. *El Registrador*, supra.

En *Rosario* v. *Registrador*, *supra*, revocamos *sub silentio* a *M. Grau e Hijos* v. *El Registrador*, supra, en este aspecto, en cuanto decidimos que el sello del Colegio de Abogados —requerido por la Ley Núm. 170 de 15 de mayo de 1939 (4 L.P.R.A. sec. 1006)— era parte de la escritura. Allí afirmamos que "una copia certificada [del original] debe expresar completa y fielmente todo lo que contiene el original, incluyendo la declaración de que tal sello se encuentre adherido, con el fin de que la copia certificada sea inscribible". *Rosario* v. *Registrador*, supra, págs. 465–466.

de fe sobre los extremos requeridos por el Registrador. De haber sido esa la intención legislativa, fácilmente se hubiese dispuesto que el sello fuera adherido y cancelado en el propio afidávit. De esta forma surgiría de su faz, con mayor resplandor el cumplimiento de esta formalidad. ([6])

Resolvemos que el Registrador no podía pedir al Bayamón Federal que acreditara que el notario Fournier Torres incluyó el afidávit en su registro, adhirió, canceló el sello y lo anotó en su índice semanal. Todas estas son formalidades que carecían de sincronía. Son deberes que la ley contempla después de suscrito el documento.

## V

■ Nos resta trazar el horizonte final adjudicativo de nuestra decisión. Si bien la controversia se produce con relación a los afidávit que pretenden entrar directamente al Registro por ley especial, ciertamente el interés público y jurídico rebasa ese trasfondo. El objetivo de haber cumplido los requisitos legales necesarios para que un afidávit sea lo más perfecto posible, responde a la visión general legislativa, con

---

Así pues, el fundamento del deber notarial de dar fe en las copias, de haber adherido y cancelado los sellos en el original tiene su *raison d'être* en la ley. No se trata de un deber impuesto jurisprudencialmente predicado sobre una política de prevención de nulidad en los documentos notariales. Por ello tanto *Rosario* v. *Registrador*, supra, y *Sánchez* v. *Registrador*, supra, deben ser leídos como casos que imponen la obligación al notario de dar fe en las copias de todo lo que contenga la original, pues aquéllos deben ser "traslados literales" de éstas *por virtud de ley*.

([6]) No se nos escapa el argumento de que el legislador no optó por este método, pues el único récord disponible para el Estado comprobar su cumplimiento es el Registro de Afidávit. Ciertamente, hemos de admitir que distinto a las escrituras matrices, cuyos originales son incorporados, conservados y forman parte del Protocolo Notarial, los afidávit no son mantenidos por el notario, sino entregados a los interesados.

La realidad es que existen varias alternativas para, aparte de exigir afirmativamente la dación de fe en el propio documento, dejar este tipo de constancia, a saber: adherirlo y cancelarlo en el original; en el original y en la copia, e inclusive exigir que la mitad superior del sello sea adherida en el registro y la inferior en el documento original autenticado.

eco jurisprudencial, de promover la mayor excelencia en la praxis notarial. *In re Olmo Olmo*, 113 D.P.R. 441 (1982). No se funda en la actuación y planteamientos del notario Fournier Torres que intervino en el caso de autos, contra quien no hay indicio alguno de violación notarial punible. Va más allá. Tenemos la responsabilidad de estimular ese logro propiciando "la garantía de verdad que ofrece la intervención notarial en la negociación privada para el Registro de la Propiedad —donde la corrección, exactitud y verdad son corolarios y objetivos imprescindibles para su buen funcionamiento . . .". *Sucn. Santos* v. *Registrador*, supra, pág. 835; *Talcott Inter-American Corp.* v. *Registrador*, 104 D.P.R. 254 (1975). De igual forma, la Ley Hipotecaria "debe interpretarse de modo que facilite y proteja el tráfico comercial". *Royal Bank of Canada* v. *Registrador*, 105 D.P.R. 414, 418 (1976). Idéntica dirección debemos seguir en cuanto a los documentos notariales que en virtud de estatutos especiales tienen entrada al Registro.

Al reflexionar sobre el curso decisorio, afloran varios supuestos fácticos susceptibles de conocimiento judicial. Primero, que los afidávit son documentos que constantemente convergen hacia el Registro de la Propiedad en calidad de escritos suplementarios o auxiliares que forman parte de miles de instancias basadas en dictámenes judiciales y administrativos. Segundo, que ese tráfico no sólo lo generan negocios sobre hipotecas de bienes muebles,[7] sino las múltiples formas de negocios que cotidianamente se dan sobre propiedad inmobiliaria. Tercero, es inquietante la dejadez con que lamentablemente algunos notarios incumplen sus deberes, en especial el de adherir y cancelar los correspondientes sellos. Y cuarto,

---

[7] El caso de autos es ilustrativo de este extremo. Entre los documentos presentados aparece un afidávit suscrito ante el notario A. Santiago Villalonga acreditando la capacidad y autoridad de Manuel González Gierbolini para suscribir y asumir, a nombre de la corporación deudora y como Secretario, la obligación hipotecaria.

que los inconvenientes que su fiel cumplimiento causen, quedan plenamente justificados y superados por sus beneficios. Después de todo, la "notaría es faena de tiempo y paciente integración de todos los elementos documentales, que sufren en su calidad con la festinación y la atracción de los atrechos fáciles". *Empire Life Ins. Co.* v. *Registrador*, 105 D.P.R. 136, 139 (1976).

Evaluadas integralmente las distintas disposiciones legales sobre el afidávit y su importancia en el tráfico registral de propiedad mueble e inmueble, surge palmariamente que la intención legislativa en aquéllas sólo puede alcanzarse al extender a todo afidávit la mayor garantía de veracidad en cuanto a las formalidades subsiguientes referentes a su registro y cancelación del sello de la Sociedad.

De acuerdo con la mecánica contemplada en la ley, la mejor práctica de la notaría es que se dé entrada inmediata en el Registro de Afidávit de todos los datos requeridos, y se adhiera y cancele el sello. Por estar interrelacionadas, la operación debe ser contemporánea, esto es, que sea lo más próxima posible al acto de autenticación de la firma. Frente a esta norma general visualizamos que solamente serían admisibles dilaciones justificadas fundadas en poderosas razones excepcionales, tales como haber el notario autenticado el documento fuera de su oficina, enfermedad subsiguiente u otras situaciones o emergencias impredecibles. Aclaramos, sin embargo, que el elemento de contemporaneidad es continuo y crucial.

■ Por imperativo circunstancial e interacción armoniosa de la disposición legal que exige del notario la confección del Índice Notarial y su notificación semanal todos los lunes a la Oficina de Inspección de Protocolos y Notarías, es obvio que inexorablemente ese día sería el término máximo para cumplirse con todos los requisitos mencionados. Así cobra plena vigencia y alcance el Índice. Dicho de otro modo, aun en circunstancias justificadas, a más tardar de cada lunes

deberá estar debidamente lleno el Registro de Afidávit y cancelados los sellos de la Sociedad para Asistencia Legal.

Esta interpretación es corolario de la naturaleza intrínseca de la información que debe incluirse en el índice. Aun cuando no es idéntica, la certificación del notario al rendirlos, conceptualmente guarda cierta equivalencia a una dación de fe. Esta solución representa un adecuado balance entre la excelencia y mejor práctica notarial y armoniza con todos los propósitos e intereses legislativos, inclusive el propiciar allegar fondos de la forma más rápida y regular posible a la Sociedad para Asistencia Legal.

Por los fundamentos expuestos, *se dictará sentencia que revoca la Nota Denegatoria del Registrador de la Propiedad, Sección Primera de Caguas.*