MARGARITA BIAGGI, demandante y apelante, *v.* SUCESIÓN DE ANGELINA ESBRÍ VIUDA DE BAUZÁ, ET AL., demandados y apelados.

Núm. 10032.—*Sometido:* Febrero 15, 1950. *Resuelto:* Mayo 26, 1950.

*Carlos E. Colón,* abogado de la apelante; *Rafael Hernández Matos* y *Ramón G. Goyco,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tribunal.

La apelante instituyó este pleito sobre otorgamiento de escritura contra la Sucesión de su madre Angelina Esbrí viuda de Bauzá. Alegó que la causante falleció en diciembre de 1946; que la demandante y ella vivieron juntas y que esta última le tomó a préstamo, en distintas partidas, la cantidad de $2,730; que para satisfacer dicha suma la Sra. Esbrí había convenido con la demandante en traspasarle dos fincas urbanas que se describen en la demanda y que a ese efecto dió instrucciones al notario Agustín E. Font para que preparase la escritura; que tan pronto fué perfeccionado el contrato, la demandante tomó posesión de los bienes y empezó a cobrar los cánones de arrendamiento a partir del mes de

diciembre de 1946, precisamente el mismo mes en que falleció la alegada vendedora sin otorgar documento alguno; que requirió a los demás miembros de la Sucesión para que cumplieran el contrato de su causante y que habiendo ellos rehusado, solicitaba sentencia de conformidad.

Los demandados radicaron su contestación en la cual negaron las alegaciones esenciales de la demanda.

La corte a quo, después de recibir una extensa evidencia, llegó a la conclusión de que la Sra. Esbrí en ningún momento convino con la demandante en cederle en pago las dos fincas, siendo ésta la cuestión fundamental en el presente recurso. En apoyo del mismo se imputan a la corte inferior cuatro errores. De ellos, tres van dirigidos a atacar la apreciación de la prueba, y el restante consiste en no haber admitido la declaración de la demandante en conexión con las alegadas transacciones celebradas entre ella y la finada.

■■ Iniciaremos la discusión haciendo un resumen de la prueba presentada por la demandante.

La demandante vivió con su señora madre hasta el fallecimiento de ésta; la hija le había prestado dinero en distintas partidas, ascendentes a $2,730, y deseando la Sra. Esbrí satisfacerle esa deuda convinieron entre ellas en el traspaso de dos solares radicados en la ciudad de Ponce. A ese efecto la madre dió instrucciones al notario Agustín E. Font para que procediese a preparar la documentación pertinente, pero advertida por el notario de la necesidad de levantar un plano de los solares, ya que éstos debían segregarse de fincas de mayor cabida, encomendó su preparación al agrimensor José Serra Gaztambide, siendo los planos entregados al referido notario, quien no llegó a preparar la documentación por haber fallecido la Sra. Esbrí.

¿Erró la corte a quo al no dar crédito a esta prueba? El Lic. Font declaró que la Sra. Esbrí lo había llamado a su casa para consultarle si ella podía vender unos solares a pesar de estar hipotecados. Si bien al principio de su declaración admitió que la Sra. Esbrí le había dicho que la escri-

tura de venta debía otorgarse a favor de la demandante, más adelante rectificó negando que se hubiera hablado de preparar escritura alguna con ese fin.

El agrimensor Serra Gaztambide, refiriéndose a la encomienda para la preparación de los planos, declaró que él recibió una nota sin firma en la cual se le pedía que los preparase; que la nota le fué entregada personalmente por el cobrador de la Sra. Esbrí quien le dijo que se la enviaba doña Angelina; que como no estaba firmada, para cerciorarse de su autenticidad, llamó a la casa de la Sra. Esbrí, quien ratificó por teléfono el contenido de la nota, pero que él no conocía su voz.

Herminio Velázquez declaró que fué cobrador de la Sra. Esbrí; que ésta le había informado de la transacción celebrada con la demandante; que la Sra. Esbrí le dictó una nota para Serra Gaztambide, la cual le llevó personalmente; que algunos días después, por orden de la Sra. Esbrí, entregó a Serra Gaztambide la cantidad de $30, importe de los planos, y al recibir éstos, los entregó al Lic. Font.

Rafael Rivera Esbrí declaró que era sobrino de la Sra. Esbrí y apoderado y consejero de la demandante; que en cierta ocasión en que se hallaba en la casa de su tía, donde también se encontraba el abogado Font, aquélla manifestó a la demandante que acababa de dar los datos a dicho abogado para que preparase las escrituras a su favor, pero que el abogado le había indicado la necesidad de preparar unos planos, los cuales se proponía ordenar; que las escrituras eran para cederle ciertas propiedades a la demandante en pago de una deuda; que después del fallecimiento de la Sra. Esbrí, fué a buscar y obtuvo del Lic. Font una copia de los planos y por indicación de éste escogió al Lic. Colón para que llevara el presente pleito.

Pedro Archeval y Josefa Colón, quienes en concepto de inquilinos ocupaban casas ubicadas en los solares que motivan este pleito, declararon que la Sra. Esbrí, antes de morir, les

había dicho que había vendido los solares a su hija y les indicó que en adelante pagasen los alquileres a la nueva dueña.

Ángel Prado, yerno de la Sra. Esbrí, como testigo de la demandante, limitó su declaración a identificar una carta que él había dirigido a la demandante y que ésta presentó y fué admitida en evidencia. (¹)

Conforme resulta de la prueba de los demandados, la Sra. Esbrí sabía escribir. Suponiendo que fuera verdad que dictó al cobrador la nota que envió a Serra Gaztambide, no da explicación alguna del motivo por el cual, por lo menos, no firmó la misma. ¿Acaso no debía ocurrírsele a ella que una nota sin firmar no podía ser aceptada como auténtica? Pero es que también resulta de la declaración de Ángel Prado,

---

(¹) La carta arroja tanta luz en el asunto y debió pesar tanto en la apreciación de la prueba, que creemos pertinente copiarla a continuación:

"Estimada Margot: Me enteró Falin de que habían tenido por teléfono una discusión por motivo de los líos que tienen con el asunto de la herencia de doña Angelina (Q.E.P.D.) y en dicha discusión me metieron a mí en algo relacionado con unos pagarés del Crédito y Ahorro Ponceño, yo deseo darte una pequeña explicación de todos estos líos, es mi deseo que hagas un momento de calma y leas esto cuantas veces quieras y puedes enseñárselo a quien te plazca, pero creo debes leerlo bien y después hacer lo mejor que creas ya que bajo ningún concepto quiero que lo tomes como una presión para que desistas de tus planes, entiende bien lo que te quiero decir ya que no tengo otro deseo de que no sirvan de mingo a nadie y que no traten de distanciarse unas hermanas de otras por pesetas más o menos que al fin nada se lleva de este mundo.

"Este asunto ya debía estar terminado y no estar gastando plata en abogados y pleitos que a nadie de nosotros beneficia y perjudica mucho, yo no puedo creer que tú estés bien empapada de cómo has presentado tus asuntos hasta ahora y puedes estar seguro de que eso no está claro y es por lo siguiente, según el récord de la Corte tú de primera intención reclamastes unos $2,730 que alegaste te debía tu mamá, que yo sepa eso nunca te lo negaron y en las conversaciones que yo entré se había decidido reconocerlo en lo que respecta a Mary y Deadina en cuanto a la otra parte nosotros no podemos obligar a que la reconozcan o no, antes de entrar en ese punto y sin ningún motivo para ello presentaste una demanda reclamando unos solares en pago de esa deuda cuya demanda por defectos fué declarada sin lugar cuya resolución está pendiente creo en el Supremo.

"Quiero que tú sepas que esa venta no se podía hacerte porque esos solares así como todo lo demás estaba y está hipotecado y no se puede vender una cosa hipotecada sin consentimiento y aprobación de los hipotecarios así que cualquier proyecto de escritura que se haga no tiene ningún

como testigo de los demandados, que la Sra. Esbrí era tan sorda que para poder hablarle precisaba gritarle al oído y por ese motivo hacía años que no podía hablar por teléfono. Siendo ello así, ¿cómo podía el juez dar crédito a la declaración de Serra Gaztambide con respecto a su conversación con la Sra. Esbrí, máxime si Serra no conocía su voz? ¿No parece más razonable que si ella no' quería o no podía escribir, dictara la nota a su propia hija, la demandante, que vivía con ella y le administraba sus asuntos? Pero concurren otras circunstancias altamente sospechosas en el presente caso. Antes de instar este pleito se radicó en la corte inferior un procedimiento de administración judicial cuya petición fué jurada por la demandante. En dicho procedimiento se rela-

valor cuando en el asunto no han mediado ni firmado las partes interesadas, mientras una cosa no se legalice tratándose de asuntos tan complicados como ése, no tiene ningún valor, además si acaso sales ganando lo más sería que te dieran lo que alegas te debía o sean los dos o tres mil que fueran y eso cuando en gastos ya pasarán de esa suma y años de pleitos, eso es así y no de otra manera, no me creas a mí y consulta con personas que estés segura no tienen prejuicios contra ninguno de ustedes.

"Sobre el asunto del pagaré resultó que yo fuí quien garanticé a tu mamá en el Banco, cantidad de unos tres mil quinientos dólares y que al fallecer sólo debía unos $800 o algo parecido, que ya lo pagaron cuando noté que el pagaré que el Banco reclamaba no era uno que yo había dejado firmado en blanco cuando me fuí a España, me sorprendió eso y entré a averiguar a dónde podría haber ido a parar dicho documento y lo encontré, dicho documento fué llenado por un empleado del Banco pero al darlo para que cogieran la firma de doña Angelina no sé por qué motivo aparece firmado Angelina E. Bauzá, pero no es la letra de ella, es la letra tuya y dicho pagaré no lo aceptaron en el Banco, tu no podías hacer eso en un documento oficial del Banco y usar mi firma ni firmar por ella aunque tuvieras un poder, pues con el poder podías firmar el nombre de ella y el tuyo debajo, pero en letra clara y sin tratar de hacer imitaciones, eso no se puede hacer es un delito y ningún apoderado puede pasarse en venta nada de quien le dió el poder ése es otro delito, yo desde luego no tengo la intención de hacer uso de este documento para perjudicarte, porque eso no conduce a nada más que escándalos y sin beneficio alguno para nadie y en ese terreno yo no camino.

"Tienes que darte cuenta y hacer un examen de conciencia de qué camino es el que te conviene y no darle gusto a nadie, yo sé bien lo que dejan los líos y los pleitos y solamente se deben hacer en último extremo, yo creo tener derecho a darte un consejo pues aunque se te olviden las cosas, creo haberte ayudado a solucionar varios asuntos así como al resto de la familia sin ensuciarme las manos en un centavo y arreglé lo de

456

cionaron las bajas y el activo del caudal. Entre aquéllas no figuró la alegada deuda de $2,730 a favor de la demandante. Tampoco se consignó que los solares habían sido vendidos a ésta. Por el contrario, aparecían como bienes pertenecientes a la herencia. Fué algún tiempo después de radicada la petición de administración judicial que Rafael Rivera Esbrí pidió al abogado Font que enmendase la petición para que se hiciese aparecer dicha deuda. Si como declaró el testigo Rivera Esbrí él era apoderado y consejero de la demandante y estuvo presente cuando su tía manifestó a la demandante que había dado instrucciones al abogado Font para que preparase las escrituras de los solares, ¿no es inconsistente con

Carlos en un mes, arreglé lo de Julio en seis que era más delicado que esto y ustedes no pueden arreglarse y permiten que el dinero se pierda que los abogados sean los que salgan ganando eso es una tontería que luego le pesa a uno.

"Ahora te pregunto yo qué me resta hacer a mí que no me han pagado un centavo del entierro de doña Belén y del sitio donde están enterradas tu madre y ella, eso si es una vergüenza que tenga que recurrir a los tribunales sin embargo esperé años y tal parece que me han tomado por un tonto, ahora te pregunto yo cuando tu madre necesitaba dinero del banco a quien ella pedía la firma y quien le servía, ése era yo y ahí están las pruebas, yo desde luego sabes bien que jamás he vivido de lo ajeno y que nunca viví atenido a lo de mi esposa he vivido con el sudor de mi frente y ella tiene todo limpio cuanto heredó de su padre y creo ha viajado como pocas con mi dinero y ella sabe que yo para mí no quiero ni pido nada pero no puedo permitir que jueguen con nosotros, Margot recapacita y piensa no le des gusto a los que sólo viven de río revuelto, no tires tu plata disfruta de ella viajando y viviendo la vida no seas tonta, esos listos o que se las echan de listos para poner a pelear a las familias son seres despreciables.

"Yo se qué resultados pueden traer todos esos líos, para eso no se necesita ser abogado, solamente tener un buen sentido común y tener conciencia.

"No te dejes llevar del impulso del coraje y verás que todavía puedes vivir feliz el resto de los años que te quedan y no tirar la plata gastarla en cosas que alegren la vida y no que la agrian.

"Estudia ésto y verás que te digo la verdad y si insistes en tirarte por el despeñadero lo lamento mucho y verás que al fin no adelantarás nada y pasarás muchos malos ratos termino diciéndote que medites y trates de transar en una forma satisfactoria, yo no recurriré a bajezas ni cosas por el estilo por eso te digo que para pleitear hay que tener mucha memoria y papelitos lo demás son cuentos, espero no te sulfures y me des la razón. Como siempre te aprecia (f) Ángel."

esa declaración solicitar que se incluyese la deuda y no pedir que se consignase en el procedimiento de administración judicial que las fincas descritas en la demanda pertenecían a la aquí demandante, a virtud del convenio celebrado entre la madre y la hija? En el caso de *Cintrón* v. *Cintrón*, 70 D.P.R. 770, donde se trataba de una supuesta venta verificada por un padre a favor de una hija con perjuicio de los demás herederos del primero, dijimos:

"No debemos perder de vista el principio bien establecido de que las transacciones entre parientes cercanos que puedan perjudicar a otras personas, deben ser examinadas con cautela. *Mackall* v. *Mackall,* 135 U.S. 167."

Consideradas todas estas circunstancias, no compartimos la opinión de la parte apelante al efecto de que el juez sentenciador incurriera en error en la apreciación de la prueba. Lejos de eso, sus completas y juiciosas conclusiones de hecho y de derecho revelan un cuidadoso y acabado estudio del caso. Se invocan por la apelante los casos de *Caballero* v. *González*, 53 D.P.R. 539; *Navarro* v. *Compañía Azucarera "El Ejemplo"*, 53 D.P.R. 726 y *Quock Ting* v. *United States*, 140 U.S. 417, para sostener que no habiendo sido contradicha la evidencia de la parte apelante, la corte venía obligada a darle entero crédito. No es ése el alcance de la doctrina sostenida en esos casos. La regla es al efecto de que las cortes no pueden dejar de creer a un testigo cuya declaración no ha sido contradicha, a menos que exista un motivo razonable para no creerla. En el presente caso, la corte sentenciadora tenía motivos para dudar de la veracidad de los testigos, y siendo ello así, en el supuesto de que no se hubiera presentado evidencia para contradecirlos, el propio testimonio de ellos ponía en duda su veracidad.

El hecho de que el juez, mientras declaraba el testigo José Serra Gaztambide, manifestara que deseaba inhibirse del caso porque ese testigo no le habría de merecer crédito por su manera de declarar en otro caso ante él, no es motivo para revocar la sentencia, pues como ya hemos visto, la

declaración de este testigo es tan sospechosa que sin ese alegado prejuicio, el juez hubiera estado justificado en no darle crédito. Pero es que además, cuando así se manifestó el juez en el acto del juicio, el abogado de la apelante insistió en que no se inhibiese y protestó de la confianza absoluta que tenía en la honorabilidad del juez. En tales circunstancias, no vemos cómo puede ahora ir contra sus propios actos cuando el resultado del juicio le es adverso.

Consideraremos ahora el restante error.

■ Al tratar la demandante de declarar sobre las transacciones habidas con su señora madre, los demandados invocaron la sección 3 de la Ley de 10 de marzo de 1904 (²) para que no se le permitiese declarar sobre el extremo indicado. La corte sostuvo la objeción y es esa resolución la que la apelante señala como error. Esta invoca el caso de *Boscio* v. *Vilá*, 67 D.P.R. 604 y sostiene que revocó la doctrina establecida en el de *Wilcox* v. *Axtmayer, et al.*, 23 D.P.R. 343. No hubo tal revocación. En el caso de *Wilcox*, supra, la demanda fué dirigida contra Henry Axtmayer y la Sucesión de su padre Jacob Axtmayer, y se trataba de una acción en cobro de honorarios de abogado en la que se alegaba que Jacob Axtmayer se había obligado con el demandante a pagar los servicios profesionales prestados por el demandante a su hijo Henry. Se invocó la misma sección que ahora invoca la apelante y se sostuvo la oposición a que Wilcox declarase sobre el convenio celebrado entre él y el difunto Jacob Axtmayer con respecto al pago de los servicios profesionales. El

---

(²) La sección 3 de la Ley de 10 de marzo de 1904 (pág. 121), prescribe:

"En las demandas *por o en contra* de los albaceas testamentarios, administradores o tutores en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria; y las prescripciones de esta sección se aplicarán a todas las demandas *por o en contra de los herederos y representantes legales de un finado*, que se suscitaren de transacciones habidas con éste." (Bastardillas nuestras.)

caso de *Wilcox*, supra, está claramente comprendido dentro de las disposiciones de la sección 3 transcrita en la nota 2, ya que se trataba de una acción contra los herederos de Jacob Axtmayer fundada en transacciones habidas con su causante. En *Boscio* v. *Vilá*, supra, los hechos eran distintos al de *Wilcox*, supra, pues se trataba de una acción interpuesta por una madrastra contra su entenada en reclamación de la cuota vidual y de su participación de gananciales en una casa que se alegaba la demandante y su esposo habían vendido simuladamente a la demandada. Al tratar de declarar la demandante sobre la transacción habida entre ella y su esposo con la demandada, ésta se opuso invocando la referida sección 3. La corte sostuvo la objeción y como la demandante manifestara que no tenía otra prueba para sostener su caso, desestimó la demanda. Establecido recurso de apelación, este Tribunal declaró que si la demandante eliminaba su reclamación de la cuota vidual, no sería entonces de aplicación la referida sección 3, toda vez que la demandante se limitaría a reclamar su mitad de gananciales, y en tal caso, estaría reclamando aquello que le correspondía por su propio derecho, es decir, no como heredera de su esposo, contra una parte que tampoco era demandada como heredera de su padre, sino por el alegado título de dueña que ostentaba a virtud del simulado contrato de venta. En lo que respecta a la cuota vidual se siguió el caso de *Wilcox*, supra.

En el presente caso, la situación es igual a la de *Wilcox* v. *Axtmayer*, supra. La demandante no instituye su acción como heredera de su madre, sino a virtud del título que alega haber adquirido por el supuesto contrato celebrado con la madre, y la acción va dirigida, como en el caso de *Wilcox*, contra los herederos de la madre. De manera, pues, que se trata de una acción establecida contra los herederos de la persona con quien se celebró la supuesta transacción. Siendo ello así, la declaración de la demandante en relación con la

transacción celebrada con doña Angelina Esbrí cae dentro de las prohibiciones de la referida sección 3 y no erró la corte a quo al no admitirla.

*Procede la confirmación de la sentencia.*

El Juez Asociado Sr. Snyder no intervino.